PEOPLE v DeLISLE

Docket No. 124900. Submitted March 12, 1990, at Detroit. Decided
May 8, 1990.

Lawrence John DeLisle was arrested and charged with four
counts of first-degree murder and one count of attempted
murder on the basis of a statement he made to the police. The
statement was made following a full day of interrogation
involving a trip to Lansing, a polygraph examination, more
than three hours of questioning, the actual arrest, a return trip
to Wyandotte, fingerprinting, being placed in a cell for approxi-
mately three hours, and more than two hours of additional
interrogation. At the preliminary examination, defendant
moved to suppress his statement on the ground that it had not
been made voluntarily. The motion was denied and defendant
was bound over for trial in Recorder's Court of Detroit. Defen-
dant renewed his motion to suppress in Recorder's Court. An
evidentiary hearing was held, after which the court, Robert J.
Colombo, Jr., J., stated its findings of fact and concluded that
defendant's statement was made involuntarily. The motion to
suppress was granted. The people appealed by leave granted.

The Court of Appeals *held:*

It cannot be said that the trial court clearly erred in holding
that defendant's statement was the culmination of the interro-
gation which began in Lansing. The evidence supports the trial
court's finding that defendant's confession was made involun-
tarily and was the result of psychological coercion. The trial
court's order suppressing defendant's statement is affirmed.

Affirmed.

1. CRIMINAL LAW — CONFESSIONS — VOLUNTARINESS — APPEAL.

The Court of Appeals in reviewing a trial court's findings of fact
regarding the voluntariness with which an inculpatory state-
ment was made must examine the entire record and make an
independent determination on the issue of voluntariness; the

REFERENCES

Am Jur 2d, Evidence §§ 529, 542, 545, 549, 550, 554, 582.

See the Index to Annotations under Confessions and Admissions;
Duress and Coercion.

trial court's findings will not be reversed unless they are clearly erroneous; a finding is clearly erroneous if the Court of Appeals is left with a definite and firm conviction that a mistake has been made.

2. CRIMINAL LAW — CONFESSIONS — VOLUNTARINESS.

Whether a defendant's confession was made voluntarily is a question for the court, not the jury, and the burden is on the prosecutor to prove voluntariness by a preponderance of the evidence; in determining voluntariness, the circumstances which must be considered include, but are not limited to, the length and conditions of the detention, the physical and mental state of the defendant, the age, mentality, and prior criminal experience of the defendant, the nature of any inducement offered, the conduct of the, police, and the adequacy and frequency of the advice of rights.

3. CRIMINAL LAW — CONSTITUTIONAL LAW — CONFESSIONS — VOLUNTARINESS — COERCION.

Coercive police activity is a necessary predicate to a finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment; coercive police activity may be psychological as well as physical.

*Frank J. Kelley,* Attorney General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief of Research, Training and Appeals, and *Jeffrey Caminsky,* Assistant Prosecuting Attorney, for the people.

*Frank D. Eaman,* for defendant.

Before: DANHOF, C.J., and CYNAR and SHEPHERD, JJ.

PER CURIAM. The people appeal by leave granted from the December 21, 1989, order of Detroit Recorder's Court Judge Robert J. Colombo, Jr., which granted defendant's motion to suppress a statement made to the Wyandotte police on the night of August 10-11, 1989. After reviewing the record made below, we are not left with a definite and firm conviction that a mistake was made and accordingly affirm.

I

On August 3, 1989, defendant was driving the family car when it plunged into the Detroit River. Although defendant and his wife managed to escape, their four minor children all drowned. Defendant stated at the time that the event was an accident, caused when defendant developed a leg cramp as he drove the car toward the river in order to give the children a scenic view. Defendant claimed that the leg cramp made it impossible for him to remove his foot from the accelerator and apply the brake.

Sergeant Galeski of the Wyandotte police contacted defendant on August 9, 1989, and invited him to take a polygraph test the next day. Defendant agreed, and on August 10 he and his wife were picked up between 7:00 and 7:30 A.M. and taken in separate police cars to a Michigan State Police facility in Lansing. When they arrived in Lansing, defendant was separated from his wife and placed in a small room with a polygraph machine. The examiner, Sergeant Palmatier of the Michigan State Police, pretested defendant, gave him *Miranda*[1] warnings, and then began the polygraph examination at approximately 10:14 A.M. The examination continued until 12:55 P.M., followed by a lunch break during which defendant was reunited with his wife. Defendant returned to the examination room at approximately 1:43 P.M. and was interrogated by Sergeant Palmatier until approximately 5:30 P.M. Sergeant Galeski then replaced Sergeant Palmatier, asked defendant a few questions, and placed him under arrest at approximately 6:08 P.M. Defendant was then transported to the Wyandotte police station, arriving at

---

[1] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

approximately 7:30 P.M. Defendant's wife presumably was taken home separately.

After his arrival at the Wyandotte police station, defendant was fingerprinted and placed in a cell from approximately 7:30 P.M. until 10:45 P.M. At that time defendant was removed from his cell and taken to a small office where he was interrogated by Sergeant Galeski, who readvised defendant of his *Miranda* rights prior to beginning the interrogation. During the course of the interrogation, defendant made statements which purportedly constitute a confession that he intentionally drove the family car into the river. The interrogation lasted until approximately 1:00 A.M.

On August 11, 1989, defendant was arraigned on four counts of first-degree murder and one count of attempted murder of his wife. At his preliminary examination, defendant argued that the statement given to Sergeant Galeski should be suppressed because it was not made voluntarily. The district court denied the motion and relied in part upon the disputed evidence in binding defendant over.

Defendant renewed his motion to suppress before the trial court. An evidentiary hearing was held on December 21, 1989. At the close of the hearing the trial court stated from the bench its findings of fact and concluded that defendant's statement was made involuntarily and accordingly granted his motion to suppress. It is from this decision that the people appeal.

II

In reaching its decision the trial court reviewed the following exhibits which were received into evidence: two videotapes of defendant's polygraph examination and interrogation in Lansing; an audiotape of defendant's interrogation by Sergeant

Galeski in Wyandotte; a transcript of the audio-tape, which the trial court recognized contains numerous errors; the *Miranda* rights waiver which defendant signed in Wyandotte; an advice of rights and polygraph waiver which defendant signed in Lansing; a videotape, prepared by defendant, consisting of fifty minutes of excerpts from the complete videotapes of the Lansing session; and a photograph which apparently shows defendant resting his head on Sergeant Galeski's shoulder while he is being arraigned on August 11, 1989.

At the suppression hearing the trial court heard testimony from Sergeant Galeski, William DeLisle and Michael Abramsky, Ph.D. Sergeant Galeski testified regarding the sequence of events beginning with defendant's being picked up on the morning of August 10 and ending with his statement being taken later that evening. Sergeant Galeski characterized defendant as looking a little tired but appearing coherent in the morning. On cross-examination, Sergeant Galeski refused to say that defendant was incoherent when he gave his statement in Wyandotte, but admitted that defendant spoke in incomplete sentences and rambled, changing subjects often and talking about whatever crossed his mind. Sergeant Galeski also stated on cross-examination that he consulted with a Dr. Kaufman, a psychologist apparently connected with the Michigan State Police in Lansing, in connection with his investigation of the incident and also to prepare for his interrogation of defendant. Sergeant Galeski testified that Dr. Kaufman recommended Sergeant Palmatier to do the polygraph examination and interrogation and also suggested that the suicide of defendant's father might be of some interest to Sergeant Galeski.

William DeLisle, defendant's uncle, testified that defendant appeared to be hallucinating immedi-

ately after his arraignment. The witness testified that defendant abruptly broke off his conversation with the witness and began to shout as though he were addressing his dead father.

Dr. Abramsky testified that he is a licensed psychologist and that he interviewed defendant on August 28 and September 17, 1989, for approximately two hours each time.

Dr. Abramsky stated that, after reviewing the videotapes and audiotapes, it was his opinion that defendant's interrogators, especially Sergeant Palmatier, used hypnotic techniques. In his opinion, the statement given by defendant to Sergeant Galeski later that evening in Wyandotte was the direct result of the techniques used in Lansing, which were carried over to a lesser extent in Wyandotte.

The prosecution did not contest Dr. Abramsky's status as an expert and offered no testimony in rebuttal. The trial court found that the videotapes constituted compelling evidence that defendant's will to resist the accusations and suggestions faded over the course of the day and that by the end of the session in Lansing defendant's will to resist had collapsed. The trial court found that defendant's statement to Sergeant Galeski in Wyandotte later that night was the product of the Lansing interrogation and defendant's resulting psychological state. The court concluded that the "totality of the circumstances demonstrate [sic] the statement given by the defendant to the Wyandotte Police on August 10th and 11th, 1989 was involuntary."

III

Whether a defendant's confession is voluntary is a question for the court and not the jury. *People v*

*Walker (On Rehearing),* 374 Mich 331, 338; 132 NW2d 87 (1965). The burden is on the prosecutor to prove voluntariness by a preponderance of the evidence. *People v Carigon,* 128 Mich App 802, 805; 341 NW2d 803 (1983), lv den 422 Mich 930 (1985). In determining whether a statement is voluntary, the circumstances which must be considered include, but are not limited to, the length and conditions of the detention, the physical and mental state of the defendant, the age, mentality, and prior criminal experience of the defendant, the nature of any inducement offered, the conduct of the police, and the adequacy and frequency of the advice of rights. *People v Conte,* 421 Mich 704, 754; 365 NW2d 648 (1984). In reviewing a trial court's findings, this Court must examine the entire record and make an independent determination on the issue of voluntariness. However, the trial court's findings will not be reversed unless they are clearly erroneous. A finding is clearly erroneous if this Court is left with a definite and firm conviction that a mistake has been made. *People v Kvam,* 160 Mich App 189, 196; 408 NW2d 71 (1987).

Applying *Conte,* the trial court found that the length of defendant's interrogation strongly suggests that his statement was not made voluntarily. The court found that defendant's emotional state going into the interrogation was very poor due to the death of his four children just seven days before, the intense public scrutiny that he and his wife were under, and the fact that his father had committed suicide 1½ years earlier in the same car in which his children died. The court noted that defendant had only a tenth grade education and no previous experience with the criminal justice system. The court found that Sergeant Palmatier broadly hinted to defendant that he would be

treated leniently if he confessed that he snapped on the day in question, but that if he refused to confess he faced life in prison without parole for premeditated murder. The court also found that the techniques used by the interrogators were likely to produce a false or untrustworthy statement. Finally, the court found that in this case the *Miranda* warnings were insufficient to overcome the other compelling evidence that defendant's statement was not voluntary.

After reviewing the hearing transcript, the videotapes, the audiotape and the transcript of that tape, this Court cannot conclude that the trial court clearly erred. Given the evidence of the audiotape and Dr. Abramsky's unrebutted testimony, it cannot be said that the trial court clearly erred in holding that defendant's statement in Wyandotte was the culmination of the interrogation which began in Lansing.

The prosecution argues that the record does not support a finding that defendant was hypnotized, noting Dr. Abramsky's testimony that it was not possible to tell from videotape and audiotape evidence alone whether an individual is hypnotized. However, the trial court's decision does not require a finding that defendant was actually hypnotized. The trial court found that the totality of circumstances surrounding defendant's interrogation and confession makes it likely that his statement is untrustworthy.

Even under the strictest test, the issue is not whether the defendant was in fact hypnotized or precisely how deep the hypnotic trance was. Rather, the issue is whether the trial court erred in finding that the tactics used were likely to induce an involuntary confession. We are satisfied that the trial judge had before him sufficient evi-

dence to conclude that such tactics were successfully used.

Our review of the evidence that was before the trial court supports its finding that defendant's confession was involuntary and causes us to conclude that the trial court did not clearly err.

Finally, the prosecution argues that defendant's statement is admissible as a matter of constitutional law because it was not the product of coercive police activity, citing *Colorado v Connelly*, 479 US 157, 167; 107 S Ct 515; 93 L Ed 2d 473 (1986). In *Connelly*, a mentally ill person walked up to a police officer and out of the blue confessed to a crime. The Colorado Supreme Court held that the person's statements were inadmissible because they were not the product of a rational intellect and a free will. The United States Supreme Court reversed, holding that coercive police activity is a necessary predicate to a finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment. Simply taking the person's statements and admitting them into evidence did not violate the constitution.

It has long been the law, however, that coercion can be psychological as well as physical. *Chambers v Florida*, 309 US 227; 60 S Ct 472; 84 L Ed 716 (1940). "A prolonged interrogation of an accused who is ignorant of his rights and who has been cut off from the moral support of friends and relatives is not infrequently an effective technique of terror." *Blackburn v Alabama*, 361 US 199, 206; 80 S Ct 274; 4 L Ed 2d 242 (1960). Indeed, the United States Supreme Court held inadmissible a confession which resulted from 1½ or more hours of the techniques of a highly trained psychiatrist, who "by subtle and suggestive questions" induced the defendant to admit his guilt by time and time

again telling the defendant how much the psychiatrist wanted to help, how bad it would be if the defendant did not confess, and how much better he would feel if he would get his guilt off his chest. *Leyra v Denno,* 347 US 556, 559-560; 74 S Ct 716; 98 L Ed 948 (1954). Even if the trial court in this case did not use the word "coercion," the court clearly found that defendant's confession was the result of psychological coercion within the meaning of the above cases.

The trial court's order suppressing defendant's statement is affirmed and this Court's order staying trial is dissolved.